UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MICHELE FOX,

             Plaintiff,

    v.

MICHAEL FORT, in his individual and
representative capacity, and CITY OF
BATTLEGROUND,

             Defendants.

CASE NO. 3:21-cv-05037-DGE

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.    INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment based on qualified immunity. (Dkt. No. 20.) Plaintiff Michele Fox filed this action against the City of Battle Ground and Chief of Police, Michael Fort, in his individual and representative capacity, alleging gender discrimination. (Dkt. No. 1 at 2, 7.) Defendants requested summary judgment on only one of Plaintiff's claims—her claim against Defendant Fort under 42 U.S.C. § 1983. (Dkt. No. 20 at 11.) Plaintiff opposed the motion. (Dkt. No. 31.) Because Defendants raised new arguments and evidence in their reply (Dkt. Nos. 35, 36), the Court allowed Plaintiff to file

a supplemental response (Dkt. No. 38).  Plaintiff submitted her supplemental response on March 7, 2022.  (Dkt. Nos. 40, 41, 42.)  Having reviewed the motion, the responses, and the remaining record, the Court GRANTS Defendant Fort's motion on the terms set forth in this order.

## II.   BACKGROUND

Plaintiff Michele Fox has been a Battle Ground police officer since October 2008.  (Dkt. No. 27 at 1.)  Fox's claim against Defendant Michael Fort arises out of events that took place during 2018 and 2019, at which time Fort was a Battle Ground lieutenant.  Fort was hired to serve as lieutenant beginning January 22, 2018.  (Dkt. No. 21 at 1.)  He continued to serve as lieutenant until assuming the role of chief of police in February 2020.  (*Id.*)  Robert Richardson was the Battle Ground chief of police from January 2011 until February 2020. (Dkt. No. 22 at 1.)[1]

The City of Battle Ground Civil Service Commission ("the Commission") has adopted Civil Service Rules that govern the Police Department ("the Department's") hiring and promotions.  (Dkt. No. 24 at 1.)  Specifically, the Commission "[p]rovide[s] for the holding of competitive tests under the supervision of the Secretary to determine the relative qualifications of persons" to fill vacancies.  (*Id.* at 11.)

---

[1] In her Complaint, Fox alleged that Fort served as the acting chief of police.  (Dkt. No. 1 at 2 ("During some or all of [March 2018 through February 13, 2020], [Fort] had roles as the Acting Chief of Police for the department including the ability to make or influence [s]ergeant promotional decisions.").)  However, Fox provides no evidence to support that Fort ever served in the role of "Acting Chief of Police."  Additionally, Fox concedes that Fort was not chief of police until February 2020.  (Dkt. No. 31 at 4 ("With respect to both the 2018 and 2019 promotion decisions, Chief Richardson implemented a group decision-making process relying on 'group input' from then Lt. Mike Fort (Fort became Chief of Police in February 2020 upon Chief Richardson's retirement) and Lt. Kim Armstrong.").)  Therefore, the Court considers it established that Fort served as lieutenant from January 22, 2018 until February 2020.  (Dkt. No. 21 at 1.)

The Department anticipated a sergeant vacancy opening in July 2018, when Sergeant Kim Armstrong would be promoted to lieutenant to serve alongside Fort. (Dkt. No. 22 at 2-4, 7.) Armstrong would serve as the administrative support lieutenant and Fort would serve as the operations lieutenant. (*Id.* at 3.) In anticipation of the vacancy resulting from Armstrong's promotion, in Spring 2018, Ms. Lorna Ingenthron, the Secretary-Examiner for the Commission at the time, "began preparations for testing for the [s]ergeant's promotional examination." (Dkt. No. 24 at 2.)

In March 2018, Fox and five other Battle Ground officers sat the civil service examination to determine eligibility for promotion to sergeant.[2] (Dkt. Nos. 24 at 4; 27 at 2.) The officers' resulting scores were used to develop a ranked eligibility list (hereinafter "2018 eligibility list"), which was certified June 5, 2018 and set to expire December 5, 2019. (Dkt. No. 24 at 4, 97.) All six officers received a passing score of over 70 percent. (*See id.* at 30.) The rankings were as follows:

Michele Fox: 80.6%

Josh Phelps: 79.7%

Josh Runnels: 77.5%

John Graves: 75.48%

Rick Kelly: 75.48%

Edward Michael: 73.5%

[2] In her Declaration, Fox states that she took the civil service examination most recently in March 2018. (Dkt. No. 27 at 2.) However, in their motion for summary judgment, Defendants state that the examination occurred in May 2018. (Dkt. No. 20 at 1.) The Court refers to the date as it is stated in Fox's declaration.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

1    (*Id.* at 4, 97.)  Fox received the highest score; thus, she ranked first on the 2018 eligibility list.

2    (*Id.*)

3           The parties dispute whether Richardson had discretion to promote a candidate other than

4    Fox, given that she achieved the highest ranking.  Richardson and Ingenthron testified that the

5    chief of police has discretion to promote any candidate who passed the civil service examination.

6    (Dkt. Nos. 22 at 4-5; 24 at 5.)  Fox argued that the Civil Service Rules in conjunction with

7    Washington law require promotion of the highest-ranked candidate.  (Dkt. No. 31 at 2-3.)

8           Ultimately, Richardson, as the "appointing authority," promoted Josh Runnels, effective

9    July 16, 2018.  (Dkt. No. 22 at 4.)  Runnels ranked third on the 2018 eligibility list.  (Dkt. No. 24

10   at 97.)

11          In Fall 2019, another sergeant vacancy opened.  (Dkt. Nos. 22 at 7; 24 at 6.)  Because the

12   2018 eligibility list remained valid, the Commission did not need to hold a new examination.

13   (*See* Dkt. No. 24 at 6.)  Richardson promoted Rick Kelly, who tied with John Graves as fourth

14   ranked on the 2018 eligibility list before Runnel's promotion.  (Dkt. Nos. 22 at 9; 24 at 97.)

15          Since at least 2009, the only candidates promoted to sergeant were officers ranked

16   highest on the eligibility list, except for the 2018 and 2019 promotions during which Fox ranked

17   highest on the eligibility list.  (*See* Dkt. No. 30 at 2.)  The 2018 eligibly list also marked the first

18   time that a woman ranked first during Richardson's tenure as police chief beginning in 2011.

19   (Dkt. No. 27 at 2.)  Additionally, the 2018 eligibility list was unique in that it was the first list,

20   since at least 2009, to include more than three eligible candidates for promotion to sergeant.

21   (Dkt. No. 30 at 2-3.)

22          Fox alleges that she was passed over for promotion in 2018 and 2019 because of her

23   gender and that the alternative reasons proffered by Defendants—that Fox had bad interpersonal

24

1   relationships and skills—are pretextual.  (*See generally* Dkt. No. 31.)  Two incidents that

2   Defendants considered as negative factors against Fox were her communications with Officers

3   Julia MacPhee and Neil Seifert.  (Dkt. No. 20 at 4.)  The incident with Seifert involved Fox

4   confronting Seifert for publicly making discriminatory statements, specifically that he did not

5   want to bid on shifts with women.  (Dkt. No. 31 at 5.)

6       Fox argues that the Court should deny summary judgment on the issue of whether Fort is

7   entitled to qualified immunity, because there are material issues of fact as to Fort's subjective

8   intent and role as a decision-maker in the 2018 and 2019 promotional decisions.  (Dkt. No. 31 at

9   13-18.)

## III.    DISCUSSION

### A.  Legal Standard

12      Summary judgment is proper only if the pleadings, the discovery and disclosure materials

13  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

14  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is

15  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

16  showing on an essential element of a claim in the case on which the nonmoving party has the

17  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

18  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

19  for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

20  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

21  metaphysical doubt.").  See also Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

22  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

23  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B.  Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil damages[.]" *Wood v. Moss*, 572 U.S. 744, 757 (2014).  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory and constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, (2018) (internal quotation marks and citation omitted).

The Supreme Court designed a two-prong inquiry for determining an official's entitlement to qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  First, Courts consider whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right.  The second prong is whether the right was clearly

1   established at the time of the alleged violation.  *Saucier*, 533 U.S. at 201.  Courts have discretion

2   over which prong of the analysis to consider first.  *Pearson*, 555 U.S. at 236.[3]  If the Court finds

3   that the right was not clearly established, it need not determine whether the defendant's conduct

4   violated a constitutional right in every case.  *See id.* ("There are cases in which it is plain that a

5   constitutional right is not clearly established but far from obvious whether in fact there is such a

6   right.")

7        Whether the right was clearly established is "a question of law that only a judge can

8   decide."  *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).  Importantly, "the right allegedly

9   violated must be defined at the appropriate level of specificity before a court can determine if it

10  was clearly established."  *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010).  "Whether the

11  law was clearly established is an objective standard; the defendant's subjective understanding of

12  the constitutionality of his or her conduct is irrelevant."  *Clairmont v. Sound Mental Health*, 632

13  F.3d 1091, 1109 (9th Cir. 2011) (internal quotation marks and citation omitted).

14       Although there need not be "a case directly on point for a right to be clearly established,

15  existing precedent must have placed the statutory or constitutional question beyond debate."

16  *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (quoting *Kisela*, 138 S. Ct. at 1152).

17  Indeed, "the clearly established law at issue 'must be particularized to the facts of the case.'"

18  *Foster*, 908 F.3d at 1210 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

19  **C.  Fort's Motion for Summary Judgment Based on Qualified Immunity**

20       Fox named Fort in "his individual capacity for purposes of Plaintiff's claims for damages

21  and representative capacity for her claims for injunctive relief[.]"  (Dkt. No. 1 at 2.)  Qualified

22

23  ---

[3] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier* requiring the
24  district court to decide each question in order.

immunity "is a defense available only to government officials sued in their individual capacities." *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 965 (9th Cir. 2010). Thus, this Order applies only to Fox's claim against Fort in his individual capacity. Fox's remaining claims are not impacted.

Fox alleges that Fort deprived her of her Fourteenth Amendment right to be free of sex discrimination by depriving her promotions in 2018 and 2019, causing the 2018 eligibility list to expire on December 5, 2019, deterring Fox from taking the civil service examination in 2020, and denying Fox sergeant training opportunities. (Dkt. No. 1 at 7.)

Fort argues that he is entitled to qualified immunity because he did not violate any clearly established right. (Dkt. No. 20 at 16.) Fort states that, because he was a lieutenant during 2018 and 2019, he was not the decision maker with respect to the sergeant promotions, and therefore, "[t]o the extent that [Fox's] discrimination claims are premised on her being denied promotion to sergeant; [Fort] is entitled to qualified immunity as he did not deny her promotion to sergeant." (Dkt. Nos. 20 at 16; 35 at 4.) Fort argues further that "[t]here is no 'clearly established' law that prohibits a lieutenant from providing feedback and information to an ultimate decision-maker— even if the plaintiff alleges that the ultimate decision-maker reached an unfair or discriminatory hiring or promotional decision." (Dkt. No. 20 at 16.)

In opposition, Fox argues that "there are material factual disputes as to whether Fort [was] a 'decision-maker' with regard to the promotion and training denials in this case." (Dkt. No. 31 at 1.) Further, Fox argues that "[e]ven if Fort's discriminatory conduct in the promotion decision-making processes is characterized as giving 'feedback and information' or 'advice … leading to the promotion decision,'" the law is clearly established that "any form of international sex discrimination in the workplace violates the Equal Protection Clause" and "any state actor

who personally participates in unconstitutional conduct or sets in motion a series of acts that lead to a constitutional deprivation may be personally liable." (*Id.* at 2.)

        1.    <u>Fort Was Not the Decision-Maker in the 2018 and 2019 Promotional Decisions.</u>

Fox argues that there is a factual dispute as to Fort's role as a decision-maker and denying someone promotion due to their gender is against clearly established law. In *Ballou v. McElvain*, the Ninth Circuit Court denied qualified immunity where a female police officer alleged that the police chief intentionally subjected her to an internal affairs (IA) investigation to preclude her from eligibility for promotion and then denied her said promotion. 14 F.4th 1042, 1055 (9th Cir. 2021) ("[police chief] is therefore not entitled to qualified immunity on the claim that he encouraged and sustained discriminatory investigations into [the plaintiff's] workplace performance and thereby denied her promotion at least in part on the basis of sex.").

Unlike *Ballou*, this case does not involve a police chief. Fox conceded that Richardson was the chief of police at the time the 2018 and 2019 promotional decisions were made. (*See* Dkt. No. 27 at 2 ("From 2011-2020, the City of Battle Ground Chief of Police was Chief Richardson. … From February 2021 until the present, Chief Fort has been Chief of Police.").) Fox does not dispute that, as chief, Richardson was the "appointing authority," and therefore, the ultimate decision maker with respect to hiring, firing, and promotional decisions. (Dkt. No. 24 at 5.) Instead, Fox relies on excerpts of deposition testimony to argue that the promotional decisions were "group decisions." However, these excerpts, read in context, establish that Fort and Armstrong provided input and feedback to Richardson to assist him in making promotional decisions, but "there is no evidence at all that would create a factual dispute as to whether [Fort]

was the decision-maker in either 2018 or 2019 promotions."[4]  (Dkt. No. 35 at 4.)  Because Fort

was not authorized to make promotional decisions in 2018 and 2019, *Ballou* is distinguishable.

       2.    <u>Plaintiff Fails to Establish that Fort's Conduct Violates Clearly Established Law</u>
<u>Prohibiting Sex Discrimination in the Workplace.</u>

Fox argues, "[e]ven if Fort's discriminatory conduct in the promotion decision-making

process is characterized as giving 'feedback and information' or 'advice … leading to the

promotion decision,' … the law is clearly established that *any* form of intentional sex

discrimination in the workplace violates the Equal Protection Clause[.]"  (Dkt. No. 31 at 2.)

---

[4] Fox points to the following excerpts, which when read in context support only that Fort and Armstrong participated in the decision-making process but did not act as ultimate deciders for either promotion.

Fox cites Richardson's deposition. (Dkt. No. 32-13 at 11 ("It's a group decision.  Ultimately, I'm responsible for the decision.")); (*Id.* at 6 ("It's group input.  Ultimately, it's my decision.")); (*Id.* at 10 ("[After the chief's interviews,] I know I had a meeting with – it would have been myself, Mike and Kim, Lieutenant Fort and Lieutenant Armstrong [to discuss who should be promoted in 2018].")); (*Id.* at 18 ("I think [Fort and Armstrong] had about the same [latitude in the decision-making process for 2019 as they did in 2018]")); and (*Id.* at 10 ("I believe it was a discussion in my office or Mike's office or Kim's office, one of our offices, trying to have a conversation so I could get input from them on who the next candidate we would pull of the list.")).).

Fox cites an interoffice memorandum written by Fort regarding his communications with Officer Phelps about the 2019 promotion.  (Dkt. No. 32-9 at 2 ("[Officer Phelps] asked [Fort] whose decision it was to make the selection. … [Fort] said it was a collective between Chief, Kim, and [Fort].  [Phelps] asked 'where does the decision stop.'  [Fort] said the Chief.").)

Fox cites Armstrong's deposition.  (Dkt. No. 32-10 at 4)

> My understanding of it was completely Chief Richardson's decision.  I felt like I was part of the team in providing a recommendation I guess[.] … Well, ultimately it was Chief Richardson's decision to who he promoted.  I agree that it was definitely collective in coming to that decision.  I feel like we all had equal input on that.

However, the cases cited by Fox are easily distinguishable from Fort's conduct.  As a result, it is not clearly established that Fort's actions violated a clearly established right.

  a. <u>Fort's Role in the 2018 Promotional Decision</u>

The undisputed facts are that Richardson had conversations with Fort and Armstrong about which candidate from the 2018 eligibility list to select for promotion to sergeant.  (Dkt. Nos. 21 at 4; 22 at 5; 23 at 4.)  Although at this time Armstrong was still a sergeant, she was involved in all conversations because she was slated to be promoted to lieutenant in July 2018. (Dkt. No. 22 at 5.)

Additionally, on June 15, 2018, Fort sent an email to each of the candidates on the 2018 eligibility list.  (Dkt. No. 32-1 at 1.)  In this email, Fort stated:

> As you all know, the civil service list for eligible sergeant candidates was certified on June 5, 2018.  The next step in the process for a promotional decision is a Chief's interview that consists of an opportunity for each candidate to meet with the Chief, Lt. Fort, and Sgt. Armstrong.  The Chief will make a promotional decision based on input from the previously completed civil service process, the resumes you each submitted, your work history, and an internal Chief's interview.

(*Id.*)  Fort stated that he sent the email to provide information about the process and quell rumors.  (Dkt. No. 32-11 at 6.)  Richardson states, in addition to meeting with the candidates, he reviewed past performance reviews and the candidate's Guardian Tracker (an electronic record in which employees and supervisors make notes).  (Dkt. No. 22 at 5.)

Fort volunteered to notify the candidates who were not selected for promotion to sergeant.  (Dkt. No. 21 at 5-6.)  In his Declaration, Fort states that he offered feedback to each of the candidates, including Fox.  (*Id.* at 6.)  Fort states that he told Fox that "she had significant recent conflicts with other employees internally" and recommended that she strive to establish a peer counseling program in order to demonstrate her aptitude for serving the whole department. (*Id.* at 6-7.)  Fox disputes Fort in her Complaint, alleging that Fort did not provide "any

1    weaknesses she should work on to improve" when he told her she was not selected for

2    promotion.  (Dkt. No. 1 at 4.)

3        b.  Fort's Role in the 2019 Promotional Decision.

4        To fill the sergeant vacancy opening in October 2019, Richardson again met with Fort

5    and Armstrong to discuss the remaining candidates on the 2018 eligibility list.  (Dkt. Nos. 21 at

6    7; 22 at 7; 23 at 5.)  Fort and Armstrong recommended seeking input from the current sergeants,

7    which Richardson authorized.  (Dkt. Nos. 21 at 8; 22 at 7; 23 at 5-6.)  Fort and Armstrong met

8    with each of the five sergeants, as well as the Records supervisor and prosecuting attorney to ask

9    two questions: (1) is the candidate incapable of being a supervisor, and if so, why? (2) what is

10   the candidate's best trait?  (Dkt. Nos. 21 at 8; 23 at 6.)  Fort and Armstrong reported to

11   Richardson the feedback received for all candidates on the list.  (Dkt. Nos. 21 at 8; 22 at 7.)

12   They reported that three individuals stated Fox was incapable of being a supervisor and that one

13   said she "destroys relationships."  (Dkt. Nos. 21 at 8; 23 at 6.)  Richardson, Fort, and Armstrong

14   also discussed the progress the candidates had made in relation to Fort's feedback after the 2018

15   promotional process.  (Dkt. Nos. 21 at 9; 23 at 7.)

16       c.  Fort's Role in the 2018 Eligibility List Expiration and Sergeant Training

17       Although the parties' motions relating to Fort's Motion for Summary Judgment primarily

18   focus on Fox's claim that Fort deprived her of promotion in 2018 and 2019 (see Dkt. Nos. 20,

19   31, 35, 40), Fox also alleged that Fort caused the 2018 eligibility list to expire and deprived her

20   of sergeant training opportunities.  (Dkt. No. 1 at 7.)

21       Fox alleged that "[o]n September or October 2019, Defendants told [Fox] and others on

22   the list that instead of letting the [s]ergeant list expire on December 5, 2019 and re-testing they

23   would be extending the time period in which the list was valid."  (Id. at 4.)  Then, on December

24

5, 2019, the day after Fox provided a notice of tort claim to the City of Battle Ground, Fox alleges that Fort informed her that "he had changed his mind about extending the [s]ergeant eligibility list … even though Defendants knew there would be another [s]ergeant opening due in the coming weeks" in 2020. (*Id.* at 5.)  Fox decided not to re-test to be on the 2020 eligibility list. (*Id.* at 5-6.)

Fort provides evidence that, in April 2019, he inquired about extending the 2018 eligibility list beyond December 5, 2019.  (Dkt. No. 24 at 93-97.)  Secretary-Examiner Ingenthron advised against such an extension "because that list had only been certified for 18 months and there was nothing on that certified list to indicate that it may be extended (for example, language on the certified list that stated it would expire after 18 months 'unless extended by vote of the Commission')."  (*Id.* at 5, 93-97.)  Ingentrhon was unaware of a time in the past in which an eligibility list was extended.  (*Id.* at 5.)  (*See also id.* at 36 ("[Civil Service Rule 9.05.03] Promotional eligibility lists shall be valid for eighteen (18) months following certification by the Commission.")

On November 20, 2019, the Department held a leadership training.  (Dkt. Nos. 21 at 18; 23 at 8.)  In May 2019, supervisors were notified that their attendance was mandatory and that they should "pass this opportunity on to [their] staff."  (Dkt. Nos. 21 at 18; 23 at 8.)  On November 13, 2019, Armstrong "sent an email out to the supervisors to let them know that there had been two cancellations in the training that could be filled by department members."  (*Id.*)  Fox's sergeant at the time, Runnels, admitted not forwarding the information to Fox.  (Dkt. No. 21 at 19.)  Fort states that he did not know Runnels did not invite Fox to attend the training "until after the fact."  (*Id.* at 11.)

      d.   <u>Fort's Conduct is Distinguishable from Clearly Established Law Proscribing Gender Discrimination in the Workplace.</u>

Fox argues that if the Court finds that Fort was not the decision-maker, the law clearly establishes that a public official who purposefully discriminates based on gender in giving "information and feedback" or "offering advice … leading to a promotional decision" violates Equal Protection.  (Dkt. No. 31 at 18.)  Fox argues that "the law is clearly established that all forms of intentional discriminatory conduct in the workplace are prohibited," citing *Flores v. Pierce*, 617 F.2d 1386 (9th Cir. 1980) and *Lindsey v. Shalmy*, 29 F.3d 1382 (9th Cir. 1994).[5] However, neither case can be fairly characterized as proscribing *all* discriminatory conduct by anyone in the workplace.

In *Flores*, plaintiffs brought a 42 U.S.C. § 1983 suit against the police chief, mayor, and several city councilmen who, in their official capacity, filed protests against the Mexican American plaintiffs' application for a liquor license.  617 F.2d at 1388.  Because under California law a protest by the city blocks the issuance of a liquor license until a hearing is held, the officers acted to selectively delay the plaintiffs' licensure.  *Id.*  The Ninth Circuit Court denied qualified immunity because "[n]o official can in good faith impose discriminatory burdens on a person or group by reason of racial or ethnic animus[.]"  *Id.* at 1392.

Because *Flores* presents an entirely different factual situation, it does not prove Fort violated a clearly established right by providing feedback and advice relating to a promotional decision that Fox alleges was motivated by gender-based animus.  Further, the facts do not

---

[5] Fox also cites *Ballou*, however, the Court determined that *Ballou* does not show that Fort violated a clearly established right, given that it involves a promotional decision-maker and not a subordinate who advised the decision-maker.  *See supra*, Section III, Part C.1.  Moreover, as already noted, the plaintiff in *Ballou* alleged the defendant "initiated several investigations charging Ballou with misconduct."  14 F.4th at 1055.  These investigations impacted the plaintiff's employment opportunities.  *Id.*  There are no similar allegations in the present matter.

suggest that Fort acted in a way that violated a clearly established right to be free of discriminatory burdens given that Fox and the other candidates were subject to the same promotional decision-making process and eligibility list expiration date.  The other candidates did attend the sergeant training; however, Fort is not shown to have taken action that precluded Fox from attending.

In *Lindsey*, the Ninth Circuit Court held the right to be free from gender discrimination is "broad enough to prohibit state actors from engaging in intentional conduct designed to impede a person's career advancement."  29 F.3d at 1385.  Therefore, it was clearly established that unfavorably altering a plaintiff's job assignments, preparing unfavorable performance evaluations of her work, and displaying a hostile attitude toward her because of her gender, violated her constitutional rights.  *Id.* at 1386.

Here, the record does not show Fort unfavorably altering Fox's job assignments, preparing unfavorable reviews, or displaying a hostile attitude toward Fox as described by the plaintiff in *Lindsey*.  Accordingly, Fox fails to establish that Fort took intentional action clearly established to be in violation of Fox's rights.

e. Personal Participation Under 42 U.S.C. § 1983

Alternatively, Fox argues that "a government employee who, because of gender, gives information, feedback, and advice leading to a promotion denial has 'personally participated in' or 'set in motion a series of acts' leading to a constitutional deprivation."  (Dkt. No. 31 at 18)  First, Fox cites *Taylor v. List*, 880 F.2d 1040, 1049 (9th Cir. 1989) (denying summary judgment for lack of personal participation in the alleged Sixth Amendment violation to prison guard defendants who prevented law clerks assisting prisoner plaintiff from accessing witnesses in his defense) and *Johnson v. Duffy*, 588 F.2d 740, 744 (9th Cir. 1978) (denying summary judgment to

1    a county sheriff, despite his lack of "personal participation" in the forfeiture of prisoner

2    plaintiff's earnings without due process, because of his omission to perform duties imposed upon

3    him).

4         Fox's argument is unavailing.  *Taylor* and *Johnson* present entirely different scenarios

5    that cannot be applied to this case to show that Fort's conduct violated a clearly established law

6    for the purposes of denying him qualified immunity.  A plaintiff opposing qualified immunity

7    may not simply state a precedent that is not connected to the facts of the case.  Indeed, the

8    inquiry of whether the government official violated a clearly established right must be

9    "undertaken in light of the specific context of the case, not as a broad general proposition."

10   *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations omitted).

11        In addition, Fox cites *Gilbrook v. City of Westminster*, 177 F.3d 854 (9th Cir. 1999) *as*

12   *amended on denial of reh'g* (July 15, 1999) and *Karl v. City of Mountlake Terrace*, 678 F.3d

13   1062 (9th Cir. 2012).  (Dkt. No. 31 at 12-13, 18.)

14        In *Gilbrook*, plaintiffs alleged that they suffered adverse employment actions in

15   retaliation for exercising their First Amendment rights after a "multi-tiered termination process."

16   177 F.3d at 852-53.  One defendant initiated a disciplinary action against each plaintiff by

17   sending a notice of termination, outlining the reasons for the discharge.  *Id.* at 850.  Then,

18   another defendant conducted plaintiffs *Skelly* hearings[6] and affirmed the first defendant's

19   termination recommendation.  *Id.*  The final decision-maker defendant then "reviewed the

20   recommendations of discharge and made the final determination" to sustain the termination of

21

22   _____

     [6] "The term 'Skelly hearing' derives from *Skelly v. State Personnel Board,* 15 Cal.3d 194, 124
23   Cal. Rptr. 14, 539 P.2d 774, 783–84 (1975), in which the California Supreme Court held that a
     civil service employee has a property interest in the continuation of employment, an interest that
24   is protected by the right of due process."  *Gilbrook*, 177 F.3d at 851 n. 1 (9th Cir. 1999).

1    some plaintiffs and give two plaintiffs suspension and reduction of pay rather than termination.

2    *Id.* at 850-51.  Although the jury found that the first two defendants acted with a retaliatory

3    motive, it found that the decision-maker did not.  *Id.* at 853.  The Ninth Circuit Court held that the

4    first two defendants were not necessarily absolved by the final decision-maker as a matter of law.

5    *Id.* at 855 ("[A] subordinate cannot use the nonretaliatory motive of a superior as a shield against

6    liability if that superior never would have considered a dismissal but for the subordinate's

7    retaliatory conduct.").

8        The conduct of the first two defendants in *Gilbrook* is not similar to that of Fort because

9    those defendants initiated disciplinary actions, which became the reason that the final decision-

10   maker decided to terminate or suspend the plaintiffs.  The record does not show Fort disciplining

11   Fox or initiating an investigation into to her conduct, which later became the grounds for

12   Richardson to deny her promotion.  Therefore, *Gilbrook* does not serve to show that Fort

13   violated clearly established law.

14       In *Karl*, the Ninth Circuit Court held that it was "clearly established in December 2008

15   that a supervisor cannot retaliate against a public employee for [their] subpoenaed deposition

16   testimony offered as a citizen in the context of a civil rights lawsuit."  678 F.3d at 1065.  The

17   plaintiff was an administrative assistant employed by the City of Mountlake Terrace Police

18   department who provided testimony in former police officer's civil rights lawsuit.  *Id.* at 1066.

19   During her testimony, she spoke negatively about the assistant chief of police ("the defendant").

20   *Id.*  The defendant was overhead commenting about the plaintiff's testimony and saying that the

21   Department would have to get rid of her.  *Id.*  The defendant informed the new chief of police

22   that the plaintiff's work was deficient, sought to transfer her to a position under his direct

23   supervisor, encouraged her to accept the position by reminding her she could be fired if she

24

1  refused, imposed unreasonable and arbitrary performance targets on the plaintiff alone, and

2  informed the Chief of police that the plaintiff made inadequate progress in her new position.  *Id.*

3  at 1073.  Due to the defendant's retaliatory conduct, he was denied qualified immunity.  *Id.* at

4  1075.

5       Fort's conduct does not align with the defendant in *Karl* for several reasons.  First, Fort

6  provided input about Fox along with all other candidates when asked by Richardson in the

7  context of a promotional decision.  Fort provided equal input to that provided by Richardson and

8  Armstrong.  (*See* Dkt. No. 32-10 at 4.)  Fox also concedes she has never heard Fort make

9  disparaging comments about women (Dkt. No. 36 at 4) or give her a negative comment in

10  Guardian Tracker (Dkt. No. 25 at 10).  Thus, *Karl* is distinguishable.

11      Even if the Court considers the facts as described by Fox, she fails to establish that Fort

12  violated clearly established law.

13      Fort participated designing a second promotion 'processes' which injected bias into
     a testing process intended to be objective and unbiased. … He participated in
14      passing over Fox based upon a history of alleged interpersonal conflicts which Fort
     had previously investigated and found to be 'minor'; which were inconsistent with
15      Fox' performance evaluations (one of which Fort personally signed) [;] which had
     never been discussed with Fox; and which included Fox confronting a male officer
16      about his sexist comments in the workplace.

17  (Dkt. No. 31 at 15.)  Fox fails to establish that this conduct violates clearly established law given

18  that the cases presented are all distinguishable from Fort's role in the promotional decisions.

19  This is because all of them contained evidence of a defendant engaging in negative action against

20  a plaintiff that was the impetus for the discriminatory decision or outcome.  As a result, existing

21  precedent does not provide answers to this constitutional question beyond debate, as required for

22  a denial of qualified immunity.

23      3.  <u>Factual Disputes of Fort's Subjective Intent Do Not Defeat Summary Judgment</u>

24

1    Regarding Fort's subjective motivation while he gave feedback, information, and advice

2    to Richardson, Fort argued that "the only actual evidence before this court is that defendant Fort

3    advocated for plaintiff and has been uniformly positively and supportive of her."  (Dkt. Nos. 35

4    at 10; 36 at 4-6, 9.)  Because Fort submitted of new evidence of his motivation in his reply, the

5    Court allowed Fox to supplement her response.  (Dkt. No. 39.)

6    Fox argued that she had submitted "both evidence of bias and evidence Fort's

7    explanations are unworthy of credence."[7]  (Dkt. No. 40 at 4.)  Specifically, Fox argued that

8    "Defendant's reasons for passing over [Fox] were false and Fort knew them to be false." (*Id.* at

9    2-3.)  Fox asserted that her evidence shows Fort knew Fox's interactions with MacPhee to be

10   minor (*id.* at 3), and that Fort knew Fox had created a peer support system for the Department

11   although he claimed to the EEOC that she had not (*id.* at 4-5).  Fox also argued that the fact that

12   Fort referred to "basic" and "preferred" skills in his response to the EEOC, but concedes those

13   terms were not used in his discussions with Richardson and Armstrong, is evidence of pretext.

14   (*Id.* at 5.)  Finally, Fox argued that "[a] jury could find the act of soliciting [five] male sergeants

15   to opine whether a female is 'incapable' of supervision as an invitation to sex stereotyping."  (*Id.*

16   at 6.)

17

18

19

20   [7] The evidence Plaintiff submitted with her supplemental response includes emails between Sofia
     Mabee (an attorney) and Secretary-Examiner Ingenthron about Defendants' obligations to
21   promote the top candidate under Washington Civil Service statutes.  (Dkt. No. 42-1 at 1-3.)
     Plaintiff requests that the Court not consider the contents of the emails because Defendants
22   allegedly violated Federal Rule of Civil Procedure 26(b)(5)(B) by not returning information
     produced in discovery that is subject to a claim of privilege.  (Dkt. No. 43 at 3-4.)  Because the
23   Court does not rely on Plaintiff's supplemental declaration (Dkt. No. 42) in reaching its decision,
     the Court does not decide whether Defendants have violated Federal Rule of Civil Procedure
24   26(b)(5)(B) at this time.

On a motion for summary judgment involving a claim of gender discrimination, the Ninth Circuit Court has required courts to ensure sufficient evidence of intent before denying a government official qualified immunity.

> Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment.  The court must satisfy itself that there is sufficient "direct or circumstantial evidence" of intent … to create a genuine issue of fact for the jury, before it can ***deny*** summary judgment[.]

*Lindsey*, 29 F.3d at 1385 (emphasis added).

Notably, in *Lindsey*, the Ninth Circuit Court denied qualified immunity, whereas here the Court is granting qualified immunity based on the clearly established right prong of the analysis. Plaintiff, arguably, has not presented sufficient direct or circumstantial evidence establishing Fort's intent.

Moreover, because the Court determines, as a matter of law, that Fort did not violate a clearly established right, it becomes unnecessary to determine whether Fox provided sufficient evidence of Fort's intent.  Thus, a factual dispute, even if it existed, about Fort's subjective intent would not defeat summary judgment on the issue of qualified immunity.  Fort, therefore, is entitled to qualified immunity because his actions did not violate a clearly established right.

## IV.   CONCLUSION

Accordingly, and having considered Defendants' motion, the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that Defendants' Motion for Summary Judgement (Dkt. No. 20) is GRANTED.

1. Plaintiff's claim against Defendant Fort in his individual capacity under 42 U.S.C. § 1983 is DISMISSED with prejudice.

1    Dated this 22nd day of March, 2022.

2

3

David G. Estudillo
4    United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24